ANNE BOGOVICH, Plaintiff v. EMBASSY CLUB OF SEDGEFIELD, INC.,
ROSS E. STRANGE, and wife, ANNE STRANGE, Defendants

No. COA10-61

(Filed 19 April 2011)

### 1. Fraud— constructive fraud—breach of fiduciary duty

The trial court did not err by granting summary judgment in favor of plaintiff with respect to the constructive fraud claim based on a breach of fiduciary duty by defendant individuals. The execution and recordation of the notes and deeds of trust without prior approval, in amounts that greatly exceeded the value of their claimed loans, constituted a breach of fiduciary duty by defendants. Further, the evidence supported a reasonable inference that defendants' actions caused the corporation's property to remain unsold during the years that plaintiff paid the *ad valorem* taxes.

### 2. Unfair Trade Practices— summary judgment—constructive fraud

The trial court did not err by granting summary judgment in favor of plaintiff with respect to the unfair and deceptive trade practices claim given the upholding of summary judgment in favor of plaintiff for the constructive fraud claim.

### 3. Damages and Remedies— compensatory damages—causal connection-

The trial court did not err by submitting the issue of compensatory damages to the jury. The record did not establish that any claims adjudication procedure existed at the time the issue of damages was submitted to the jury. Further, plaintiff established

1

a causal connection between defendants' conduct and the unpaid *ad valorem* tax amounts.

### 4. Damages and Remedies— punitive damages—constructive fraud

The trial court did not err by submitting to the jury the issue of whether plaintiff was entitled to recover punitive damages from defendant individuals. Punitive damages are justified in cases of constructive fraud.

### 5. Statutes of Limitation and Repose— reimbursement for business expenses—no tolling of statute

The trial court did not err by concluding that defendant individuals' reimbursement claims for alleged monies advanced and other obligations related to the corporation that allegedly arose in the 1970s and 1980s were barred by the statute of limitations under N.C.G.S. § 1-52(1). Even if the applicable statute of limitations had been tolled until 1998, defendants never asserted a reimbursement claim.

Appeal by defendants from judgments entered 13 January 2009 and 30 March 2009 by Judge Catherine C. Eagles, from an order entered by Judge Eagles on 30 March 2009, and from an order entered 22 June 2009 by Judge Steve A. Balog, in Guilford County Superior Court. Heard in the Court of Appeals 18 August 2010.

*Smith Moore Leatherwood LLP, by Elizabeth Brooks Scherer and Matthew Nis Leerberg, for Plaintiff-Appellee.*

*Smith, James, Rowlett & Cohen, LLP, by Norman B. Smith, for Defendant-Appellant.*

ERVIN, Judge.

Defendants Ross E. Strange and Anne Strange appeal from an order granting summary judgment in favor of Plaintiff Anne Bogovich with respect to her claims of constructive fraud and unfair and deceptive trade practices, from a judgment entered in favor of Plaintiff based on a jury verdict awarding compensatory and punitive damages against the Stranges, an order denying the Stranges' request for the entry of judgment notwithstanding the verdict, and from an order denying the Stranges' claims for reimbursement of money allegedly owed to Defendants Ross and Ann Strange. After careful consideration of the Stranges' challenges to the judgments and orders at issue in this case

in light of the record and the applicable law, we conclude that the challenged judgments and orders should be affirmed.

## I. Factual Background

### A. Substantive Facts

Mr. Strange was born in 1928. At the time of trial, he had been a practicing attorney for forty-eight years. Plaintiff Anne Bogovich is Mr. Strange's older sister.

The litigation from which this appeal arises stems from the parties' ownership of Embassy Club, which was originally incorporated in 1971 by Mr. Strange, Art Lafata and Steven Kutos, all of whom owned an equal interest in the corporation. Embassy Club, which owned several acres of real property adjacent to the Sedgefield golf course, operated a private dinner club. The corporation purchased the shares owned by Mr. Lafata and Mr. Kutos in 1972 and 1973, respectively.

In 1973, Ms. Bogovich purchased fifty percent (50%) of the shares in the corporation. Ms. Bogovich and Mr. Strange are equal shareholders in and directors of Defendant Embassy Club; Mr. Strange is the corporation's president and treasurer; Ms. Bogovich is the corporation's vice president; and Ms. Strange is the corporation's secretary.

The corporation operated the dinner club from 1971 to 1976. Mr. Strange managed the club and its employees, performed physical work on the building, and had responsibility for the corporation's financial transactions and the maintenance of the corporation's records. Ms. Bogovich, who has lived in Florida since purchasing shares in Embassy Club, has not had any involvement in the daily operations of the corporation. In fact, Mr. Strange testified that Ms. Bogovich "had no idea what was going on as far as the records were concerned, as far as the corporation was concerned." Although Mr. Strange testified that he and Ms. Bogovich periodically discussed the corporation by telephone, he admitted that he never provided his sister with tax returns, balance sheets, or other corporate reports and records.

The dinner club operated by the corporation was never profitable. In December 1976, the dinner club and nearly all of Embassy Club's corporate records were destroyed in a fire. Since the fire, the corporation's property has not been used for any purpose.

In December 1998, Ms. Bogovich's attorney wrote Mr. Strange for the purpose of seeking information about "the status of the Embassy

Club" and informing Mr. Strange that Ms. Bogovich "would like to accomplish the following objectives, hopefully without the necessity of legal action: (1) [c]onveyance by the corporation of a half interest in all property owned by [the corporation] to [Ms. Bogovich], or (2) [d]issolution of the corporation with the conveyance of [one half] interest in all property owned by [the corporation] to her." After no action was taken in response to this request, Ms. Bogovich's attorney sent another letter to Mr. Strange in February 2000 requesting to be provided with an accounting and additional information about Mr. Strange's efforts to sell Embassy Club's property. Mr. Strange did not provide the requested information.

On 27 July 2000, Ms. Bogovich's attorney wrote another letter to Mr. Strange's attorney. In this letter, Ms. Bogovich's attorney stated that Ms. Bogovich was prepared to initiate a civil action against Mr. Strange for breach of fiduciary duty and gave him 30 days to "make concrete efforts to sell the property."

On 10 August 2000, Defendants Ross Strange and Anne Strange executed and recorded notes and deeds of trust on behalf of the corporation securing an alleged obligation from Embassy Club to the Stranges, as individuals, in an amount in excess of $1,300,000.00. Mr. Strange admitted that he did not discuss these instruments with Ms. Bogovich before executing and recording them. In his deposition, Mr. Strange testified that he executed and recorded these notes and deeds of trust for the purpose of ensuring that, when Embassy Club's property was sold, he would be repaid for monies that he claimed that the corporation owed him.

In his testimony, Mr. Strange attempted to substantiate his claim that Embassy Club owed him large amounts of money. For example, Mr. Strange testified that, beginning in the 1970s, he paid expenses associated with Embassy Club's operations using personal funds and that, between 1971 and 1976, he had worked at least five days a week at the club, that he handled "all the book work," and that he had performed legal services for the corporation. Mr. Strange did not, however, state that Ms. Bogovich had recognized the alleged advances as loans and admitted that he had "never discussed" payment for his alleged legal work with Ms. Bogovich, that he had not kept records documenting the nature and extent of his legal services, and that the two of them had never discussed an interest rate that would be applicable to the alleged loans. Even so, at the time when Embassy Club's insurer settled the claim stemming from the dinner club fire,

Mr. Strange retained several thousand dollars as payment for his alleged prior legal services.

In addition, Mr. Strange testified that he expected to be reimbursed for the hours that he and Ms. Strange had worked at the dinner club from 1971 until the date upon which it closed and admitted that he had executed and recorded the notes and deeds of trust for the purpose, at least in part, of collecting monies that he and his wife were entitled to receive for working at the dinner club. However, Mr. Strange conceded that he and Ms. Bogovich had never discussed a specific amount of unpaid wages to which the Stranges were entitled and that Ms. Bogovich never executed a written agreement providing that he would receive a salary for his services.

Mr. Strange did not dispute that he had a fiduciary relationship with his sister. According to Mr. Strange, Ms. Bogovich "trusted that I would do what would be right." Mr. Strange testified that he took out loans in the name of the corporation without authorization given his "friendly relationship with [his] sister." Mr. Strange did not discuss the sale of Embassy Club's property with Ms. Bogovich because his sister "always left everything up to" him. In response to questions addressing the extent of his communications with Ms. Bogovich about his right to receive a salary, Mr. Strange testified that Ms. Bogovich "just trusted" him and that they had "probably not" discussed a specific amount.

Mr. Strange testified that, ever since the dinner club building burned in 1976, he had been "attempting to sell the property" by placing signs on the land and communicating with potential buyers. Mr. Strange admitted, however, that he had declined a 2008 offer to purchase the property for $1,500,000.00 without discussing it with Ms. Bogovich. Mr. Strange had not had the property professionally appraised or listed with a realtor because such actions "w[ere]n't necessary" in view of the fact that he previously held a real estate license and was "familiar" with real estate valuation.

According to Mr. Strange, the notes and deeds of trust "were taken out solely because the Embassy Club owed that amount of money to me." However, Mr. Strange conceded that there were errors in his claims for reimbursement. For example, Mr. Strange admitted that he had erroneously compounded interest in the course of determining how much he was owed and acknowledged that the amounts specified in the notes and deeds of trust were "more than likely" based upon compounded interest, were incorrect, and "would have to

be redone completely." However, as of the date of his deposition, Mr. Strange had not taken any steps to correct these errors and admitted that, after he discovered these errors, "[he] didn't change the Deeds of Trust, but they're wrong."

### B. Procedural History

On 4 March 2004, Ms. Bogovich filed a complaint alleging that the notes and deeds of trust executed and recorded by the Stranges were invalid on the grounds that the Stranges' conduct had defrauded Ms. Bogovich and reduced the value of her Embassy Club stock. As a result, Ms. Bogovich requested the court to invalidate the notes and deeds of trust, judicially dissolve Embassy Club, and award compensatory and punitive damages against the Stranges for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices. In their answer, Defendants admitted that the Stranges had encumbered Embassy Club's real property by executing and recording the challenged notes and deeds of trust. However, Defendants denied that any of the Stranges' activities had been unlawful.

On 11 November 2004, the parties reached a mediated settlement agreement that provided, in pertinent part, that Embassy Club's property would be sold "to [a] *bona fide* purchaser for market value." On 7 September 2005, this case was administratively closed.

On 13 March 2008, however, Ms. Bogovich filed a motion seeking to have the settlement agreement enforced. In her motion, Ms. Bogovich alleged that Mr. Strange had obstructed the sale of the Embassy Club property, had failed to list the property with a realtor, and had rejected an offer to purchase the property for $1,500,000.00. In addition, Ms. Bogovich asserted that she had been paying the property taxes because the Stranges refused to do so.

On 10 April 2008, Judge Yvonne Mims Evans entered an order granting Ms. Bogovich's motion to enforce the settlement. In her order, Judge Evans ruled that Mr. Strange had obstructed the sale of the Embassy Club property, that Mr. Strange had "refuse[d] to accept or negotiate[] *bona fide* offers" to purchase the property, and that Ms. Bogovich had "been paying [] all of the taxes on the [Embassy Club], because [Mr. Strange] [had] fail[ed] and refuse[d] to do so." As a result, Judge Evans reopened this case for the purpose of enforcing the settlement agreement. On 15 May 2008, Ms. Bogovich filed a motion to set aside the order transferring this case to the inactive calendar. Judge Eagles granted this motion on 12 June 2008.

BOGOVICH v. EMBASSY CLUB OF SEDGEFIELD, INC.

[211 N.C. App. 1 (2011)]

On 24 December 2008, Ms. Bogovich moved for partial summary judgment. On 13 January 2009, Judge Eagles entered an order granting summary judgment in favor of Ms. Bogovich with respect to the constructive fraud and unfair and deceptive trade practices claims, invalidating the notes and deeds of trust, and ordering that the corporation be judicially dissolved and liquidated. According to Judge Eagles' order, "[t]he only issue remaining . . . is the amount of actual and punitive damages to which [Ms. Bogovich] is entitled to recover on her claims," with the issue "of attorneys' fees and treble damages" left "open" for later resolution.

On 14 January 2009, the parties stipulated that, in August 2000, the Stranges "executed . . . promissory notes and deeds of trust . . . in favor of themselves personally, encumbering the [r]eal [p]roperty" owned by Embassy Club and that the Stranges "are Officers of the Corporation," and "executed the Notes and Deeds of Trust in their official capacities as President and Secretary of the Corporation." The parties also stipulated that face value of the notes and deeds of trust totaled $1,327,831.00.

The damage issue was heard before Judge Eagles and a jury beginning on 20 January 2009. On 23 January 2009, the jury returned a verdict finding the Stranges liable to Ms. Bogovich for $12,165.00 in compensatory damages for breach of fiduciary duty, finding Mr. Strange liable to Ms. Bogovich for $510,000.00 in punitive damages, and finding Ms. Strange liable to Ms. Bogovich for $1.00 in punitive damages. Subsequently, the Stranges filed motions for judgment notwithstanding the verdict and for a new trial, which Judge Eagles denied on 30 March 2009. On the same date, Judge Eagles entered judgment in favor of Ms. Bogovich based upon the jury's verdict. Prior to entering judgment, Judge Eagles reduced the jury's punitive damage award against Mr. Strange from $510,000.00 to $250,000.00 as required by N.C. Gen. Stat. § 1D-25(b).

After the return of the jury's verdicts, the parties agreed that the Stranges' reimbursement claims would be heard by the court sitting without a jury. As a result, Judge Balog began conducting a nonjury proceeding for the purpose of addressing the claims reimbursement issue on 2 April 2009. On 22 June 2009, Judge Balog entered an order denying all of the Stranges' claims. Defendants noted an appeal to this Court from the 13 January 2009 order granting partial summary judgment in favor of Ms. Bogovich, the 30 March 2009 judgment, the 30 March 2009 order denying the Stranges' post-trial motions, and the 22 June 2009 order denying the Stranges' reimbursement request.

**BOGOVICH v. EMBASSY CLUB OF SEDGEFIELD, INC.**

[211 N.C. App. 1 (2011)]

## II. Legal Analysis

### A. Constructive Fraud

**[1]** First, the Stranges argue that Judge Eagles erred by granting summary judgment in favor of Ms. Bogovich with respect to her constructive fraud claim. In support of this contention, the Stranges assert that their "conduct had no aggravating factors and did not cause any disadvantage or harm to" Ms. Bogovich. The Stranges' argument lacks merit.

Summary judgment is proper when, viewed in the light most favorable to the non-movant, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c). The moving party initially bears the burden of demonstrating that no genuine issue of material fact exists. If the moving party makes the required showing, "the burden shifts to the nonmovant to adduce specific facts establishing a triable issue.'" *Lunsford v. Renn,* —— N.C. App. ——, ——, 700 S.E.2d 94, 97 (2010) (citing *S.B. Simmons Landscaping & Excavating, Inc. v. Boggs,* 192 N.C. App. 155, 163-64, 665 S.E.2d 147, 152 (2008), and quoting *Self v. Yelton,* —— N.C. App. ——, ——, 688 S.E.2d 34, 38 (2010)). On appeal, the Stranges essentially concede that there are no disputed issues of material fact, acknowledging in their brief that "the issues raised in this appeal are questions of law, as to which the court must conduct *de novo* review." Given our agreement that the pertinent facts are largely undisputed, we must next consider whether Ms. Bogovich was entitled to judgment in her favor with respect to the relevant claims as a matter of law.

> The elements of a constructive fraud claim are proof of circumstances "(1) which created the relation of trust and confidence [the 'fiduciary' relationship], and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty.

*Keener Lumber Co. v. Perry,* 149 N.C. App. 19, 28, 560 S.E.2d 817, 823, *disc. review denied,* 356 N.C. 164, 568 S.E.2d 196 (2002) (quoting *Terry v. Terry,* 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)). The Supreme Court has stated that:

"A claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud." . . . Thus, "[c]onstructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific misrepresentation." Another difference is that intent to deceive is not an element of constructive fraud. When, as here, the superior party obtains a possible benefit through the alleged abuse of the confidential or fiduciary relationship, the aggrieved party is entitled to a presumption that constructive fraud occurred.

*Forbis v. Neal*, 361 N.C. 519, 528-29, 649 S.E.2d 382, 388 (2007) (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)), and citing *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)) (other citation omitted).

After carefully reviewing the record, we conclude that the undisputed evidence demonstrated that Ms. Bogovich established a valid constructive fraud claim based on a breach of fiduciary duty by the Stranges. The Stranges do not appear to deny that a fiduciary relationship existed between them and Ms. Bogovich. They acknowledge in their brief that, because Ms. Bogovich and Mr. Strange were directors of Embassy Club, "they stood in a mutual fiduciary relationship." Since the Stranges also admit that Ms. Strange is an officer of Embassy Club, she also stands in a fiduciary relationship with Ms. Bogovich. In addition, the Stranges also admit that:

Mr. Strange prepared a series of promissory notes payable to himself and his wife secured by deeds of trust on the corporation's real estate. The documents were signed by Mr. Strange as president of the corporation and [Ms.] Strange as secretary of the corporation. The notes and deeds of trust total approximately $1.3 million. . . . Mr. Strange had no discussions with Ms. Bogovich about the notes and deeds of trust either before or after the date of their execution. There was no agreement of the parties on an interest rate. There was no formal approval of the loans. . . . The amounts claimed on the notes and deeds of trust were greatly in excess of money actually advanced by Mr. Strange to the corporation.

The execution and recordation of the notes and deeds of trust without proper approval, in amounts that greatly exceeded the value of their claimed loans, clearly constituted a breach of fiduciary duty on the part of the Stranges.

However, according to Defendants, the improper execution and recordation of these notes and deeds of trust did not constitute a valid basis for Judge Eagles' decision to grant summary judgment in Ms. Bogovich's favor with respect to her constructive fraud claim because "[t]he only wrongful conduct that [Ms. Bogovich] was able to attribute to [the Stranges] were the execution of corporate notes and deeds of trust and recordation of deeds of trust on the corporation in their favor in the amount of approximately $1.3 million." Although the Stranges effectively concede that they engaged in "wrongful conduct," they argue that their conduct was not sufficiently egregious to support a claim for constructive fraud. In essence, the Stranges contend that the "only breach of fiduciary duty that rises to the level of constructive fraud is that which has some significant aggravating factor, ordinarily the tendency to deceive, to violate a confidence, or to injure public interests." In support of this argument, the Stranges cite *Miller v. Bank*, 234 N.C. 309, 316, 67 S.E.2d 362, 367-68 (1951), in which the Supreme Court stated that:

> Constructive fraud differs from active fraud in that the intent to deceive is not an essential element, but it is nevertheless fraud though it rests upon presumption arising from breach of fiduciary obligation rather than deception intentionally practiced. Constructive fraud has been frequently defined as "a breach of duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive, to violate confidence or to injure public interests. Neither actual dishonesty nor intent to deceive is an essential element of constructive fraud."

(citing *Rhodes, id.*) (other citations omitted). The language upon which the Stranges rely specifically reiterates that an intent to deceive is not an element of constructive fraud and does not state that a "significant aggravating factor" must be proven in order to establish a valid constructive fraud claim. As a result, we conclude that this aspect of Defendants' challenge to Judge Eagles' partial summary judgment order rests upon a misapprehension of applicable law.

In addition, we reject the Stranges' argument that Ms. Bogovich was not entitled to summary judgment on her constructive fraud claim because (1) the Stranges had a valid reason for executing and recording the challenged notes and deeds of trust and (2) under appropriate circumstances, they would have been willing to cancel the challenged notes and deeds of trusts. In support of this contention, the Stranges assert that:

[T]he notes and deeds of trust were solely for the purpose of try-ing to insure that payments made to the corporation by [Mr.] Strange would be repaid, when the real estate of considerable value, the only remaining asset of the corporation, would be sold. The uncontradicted testimony of Mr. Strange is that he would have canceled the deeds of trust in order to facilitate the trans-action, in the event a contract to sell the real estate was made.

The Stranges have not cited any authority demonstrating that a defend-ant's belief that he is entitled to reimbursement for alleged loans con-stitutes a valid defense to a constructive fraud claim, and we have located no such authority during our own research. The basis for Judge Eagles' determination that the Stranges violated their fiduciary duty to Ms. Bogovich stemmed from the fact that they executed and recorded the challenged notes and deeds of trust without proper authorization rather than because the Stranges chose to act in this manner for any particular reason. As a result, we conclude that the fact that the Stranges claimed that to be entitled to reimbursement for their claims and their contention that they would, under certain circumstances, have agreed to the cancellation of the challenged instruments does not preclude a finding that they breached their fidu-ciary duty to Ms. Bogovich.

Thirdly, the Stranges argue that Judge Eagles improperly granted summary judgment in favor of Ms. Bogovich with respect to her con-structive fraud claim on the grounds that the execution and recorda-tion of the notes and deeds of trust "did not cause any disadvantage or harm to" Ms. Bogovich. The Stranges do not dispute the fact that the challenged notes and deeds of trust constituted a lien on Embassy Club's property and admit that they executed and recorded these instruments "to insure that payments made . . . by [Mr.] Strange would be repaid, when the real estate . . . w[as] sold." In addition, the Stranges concede that "[t]he amounts claimed on the notes and deeds of trust were greatly in excess of money actually advanced by Mr. Strange to the corporation." As a result, the execution and recorda-tion of the notes and deeds of trust significantly reduced the value of Ms. Bogovich's interest in the Embassy Club's assets, thus substan-tially "disadvantag[ing] or harm[ing]" her.

Fourth, the Stranges argue that Judge Eagles improperly entered summary judgment in favor of Ms. Bogovich with respect to the con-structive fraud issue because Ms. Bogovich failed to establish the amount of compensatory damages to which she was entitled.

However, Judge Eagles granted partial summary judgment in favor of Ms. Bogovich based on her unrebutted forecast of evidence tending to show a breach of fiduciary duty. Judge Eagles' summary judgment order specifically reserved the issue of the amount of actual damages which Ms. Bogovich was entitled to recover from the Stranges for determination by a jury. At bottom, the undisputed evidence established the existence of all of the elements required for a finding of liability for constructive fraud. According to well-established law, "[o]nce a cause of action is established, plaintiff is entitled to recover, as a matter of law, nominal damages . . . ." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991), *aff'd*, 331 N.C. 743, 417 S.E.2d 447 (1992) (citations omitted).[1]

In addition, the Stranges acknowledge that Ms. Bogovich claimed to be entitled to recover the monies that she spent paying *ad valorem* taxes relating to the Embassy Club's real property from 2005 through 2008 as compensatory damages. However, the Stranges argue that these tax payments "could not properly be regarded as damages" because these amounts were more properly treated as loans to the corporation recoverable through the claims reimbursement process.

At the time that Judge Eagles entered partial summary judgment in favor of Ms. Bogovich on 13 January 2009, no receiver had been appointed and the parties had not agreed to a "claims adjudication process." In fact, as late as the end of the damages proceeding before the jury, no "claims adjustment process" had been created. When the parties prepared to present their closing arguments to the jury on the damages issue, the Stranges requested Judge Eagles to preclude Ms. Bogovich's counsel from arguing that Ms. Bogovich was entitled to recover the *ad valorem* tax payments that she had made on behalf of the corporation as damages on the grounds that, after the appointment of a receiver, a claims adjudication proceeding would be conducted. In response, Judge Eagles stated that:

> [DEFENSE COUNSEL]: . . . [W]e'd ask you to instruct the jury . . . that the Court has already determined there'll be an equal division of the net assets of [Embassy Club.]
>
> [TRIAL] COURT: You know, I'm not going to get into that. . . . I have not appointed a receiver. I have not signed anything[.]

. . . .

---

1. The trial court instructed the jury, without objection by the Stranges, that Ms. Bogovich was entitled to recover at least nominal damages.

[DEFENSE COUNSEL]: . . . I think [Ms. Bogovich's counsel] will say to the jury, you know who paid these taxes of $13,500, and that's our monetary damage[.]

[PLAINTIFF'S COUNSEL]: . . . [T]hat's my damage issue.

[TRIAL] COURT: I think that is what she's going to say.

[DEFENSE COUNSEL]: I don't think she should say that[,] . . . [b]ecause those are claims, and they will be submitted in the claims adjudication process, just as our claims are.

. . . .

[TRIAL] COURT: You know, I have not made any decision. Because, when I looked at this case, there's nothing in the pleadings about these darned claims of Mr. Strange. And, you know, how that's going to be dealt with is just not here today.

[DEFENSE COUNSEL]: I'm not talking about his claims. I'm saying, she should not be allowed to bootstrap up on taxes, to say they're damages, when they truly are claims that will be presented to the receiver.

[TRIAL] COURT: I don't know that.

As a result, the record simply does not support the Stranges' contention that, at the time summary judgment was granted, a "claims adjudication process" under which Ms. Bogovich might have recovered her tax payments was in place. Furthermore, the Stranges have cited no authority establishing that, had a "claims adjustment process" existed, Plaintiff would have been <u>required</u> to seek relief through that process instead of seeking to recover those payments as damages, and we have not found any such authority during our own research.

Finally, the Stranges argue that their actions in encumbering the Embassy Club property did not proximately case Ms. Bogovich to make the unpaid *ad valorem* tax payments. However, the undisputed evidence in the record shows that: (1) beginning in the mid to late 1990s, Ms. Bogovich repeatedly asked that the Embassy Club property be sold and that she be provided with various corporate records; (2) that the Stranges subjected Embassy Club's property to liens totaling in excess of $1,000,000.00; (3) that Mr. Strange did not consult an appraiser or list the property for sale with a real estate agent; and (4) that Mr. Strange rejected offers to buy the property, including

a $1,500,000.00 offer made in the year prior to trial, without consulting Ms. Bogovich. This uncontradicted evidence is sufficient to support a reasonable inference that the Stranges' actions caused the corporation's property to remain unsold during the years that Ms. Bogovich paid the *ad valorem* taxes, thereby establishing a valid basis for a compensatory damages award. As a result, for all of these reasons, we conclude that Judge Eagles did not err by entering summary judgment in favor of Ms. Bogovich with respect to her constructive fraud claim.

## B. Unfair and Deceptive Trade Practices

[2] In addition to challenging Judge Eagles' decision to grant summary judgment in favor of Ms. Bogovich with respect to her constructive fraud claim, the Stranges argue that Judge Eagles erroneously granted summary judgment in Ms. Bogovich's favor with respect to her unfair and deceptive trade practices claim. In challenging this aspect of Judge Eagles' partial summary judgment order, the Stranges claim that "an intracorporate dispute cannot amount to an unfair trade practice." Having upheld Judge Eagles' decision to grant summary judgment in favor of Ms. Bogovich with respect to the constructive fraud issue, we need not address the merits of the Stranges' challenge to Judge Eagles' ruling concerning the unfair and deceptive trade practices claim. "Plaintiffs may in proper cases elect to recover either punitive damages under a common law claim or treble damages under [N.C. Gen. Stat.] § 75-16, but they may not recover both." *Ellis v. Northern Star Co.*, 326 N.C. 219, 227, 388 S.E.2d 127, 132 (1990) (citing *Bicycle Transit Authority v. Bell*, 314 N.C. 219, 230, 333 S.E.2d 299, 306 (1985), and *Mapp v. Toyota World, Inc.*, 81 N.C. App. 421, 426-27, 344 S.E.2d 297, 301, *disc. rev. denied*, 318 N.C. 283, 347 S.E.2d 464 (1986)) (other citation omitted). In this case, as Judge Eagles' judgment plainly indicates, Ms. Bogovich elected to receive punitive damages rather than treble damages. "[T]o obtain relief on appeal, an appellant must not only show error, but . . . must also show that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *Starco, Inc. v. AMG Bonding and Ins. Services*, 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996) (citing *Cook v. Southern Bonded, Inc.*, 82 N.C. App. 277, 346 S.E.2d 168 (1986), *disc. review denied*, 318 N.C. 692, 351 S.E.2d 741 (1987)). The Stranges have not explained how any error that Judge Eagles may have committed with respect to the unfair and deceptive trade practices issue prejudiced them given our

decision to affirm her ruling with respect to the constructive fraud issue. As a result, the Stranges are not entitled to relief on the basis of their claim that Judge Eagles erred by granting summary judgment in Ms. Bogovich's favor with respect to the unfair and deceptive trade practices issue.

## C. Compensatory Damages

[3] Next, the Stranges argue that Judge Eagles erred by submitting the issue of compensatory damages to the jury. According to the Stranges, there "was no basis for [the] recovery of compensatory damages in this case" because the *ad valorem* taxes that underlie Ms. Bogovich's compensatory damage claim "constitute recoverable claims in the dissolution and liquidation [process], not compensatory damages" and should be "recoverable by means of a claims adjudication procedure rather than as an element of damages." As we have noted above, however, the record does not indicate that any "claims adjudication procedure" existed at the time the issue of damages was submitted to the jury. In addition, Defendants have cited no authority to the effect that *ad valorem* taxes may not be an element of damages. We note, for example, that in *SNML Corp. v. Bank*, 41 N.C. App. 28, 38, 254 S.E.2d 274, 280, *cert. denied*, 298 N.C. 204, 254 S.E.2d 274 (1979), the "trial court ordered that the plaintiff recover of appellant the sum of $27,057.15, the precise amount of *ad valorem* taxes . . . which plaintiff was required to pay after all other parties failed to pay. The trial court was undoubtedly following the general rule that plaintiff was entitled to damages . . . which naturally and proximately are caused by the breach of defendant's duty to plaintiff." *See also, e.g., Dawson v. Dep't of Env't & Nat. Resources*, —— N.C. App. ——, ——, 694 S.E.2d 427, 429 (2010) (stating that the Commission "found DENR negligent and ordered DENR to pay the Dawsons damages for the purchase price, closing costs, lost earnings, appraisal fees, expert fees, and *ad valorem* taxes"). Finally, Ms. Bogovich established an adequate causal connection between the Stranges' conduct and the unpaid *ad valorem* tax amounts. As a result, the Stranges are not entitled to relief based upon this argument.

## D. Punitive Damages

[4] Fourth, the Stranges contend that Judge Eagles erred by submitting the issue of whether Ms. Bogovich was entitled to recover punitive damages from the Stranges to the jury. We disagree.

N.C. Gen. Stat. § 1D-15 provides, in pertinent part, that:

**BOGOVICH v. EMBASSY CLUB OF SEDGEFIELD, INC.**

[211 N.C. App. 1 (2011)]

(a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud[,] (2) Malice[, or] (3) Willful or wanton conduct.

(b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.

As an initial proposition, the Stranges argue that, "[b]ecause there were no recoverable compensatory damages," Ms. Bogovich was not entitled to recover punitive damages. For the reasons we have already discussed, however, Judge Eagles did not err by concluding that Ms. Bogovich was entitled to the submission of a compensatory damages issue to the jury.

In addition, the Stranges assert that Ms. Bogovich sought to recover punitive damages "solely on the basis of fraud" and note the provision of N.C. Gen. Stat. § 1D-5(4) stating that, punitive damages "shall not be awarded . . . solely for breach of contract." On this basis, Defendants assert that "[f]raud does not include constructive fraud unless an element of intent is present" and that "an aggravating factor of fraud must be proven 'by clear and convincing evidence.' " However, contrary to the implication of the Stranges' argument, there is no *per se* prohibition against the recovery of punitive damages based upon constructive fraud in the relevant statutory language.

A trial court is entitled to submit the issue of punitive damages to the jury upon a showing of constructive fraud. . . . As discussed above, the trial court properly determined that a fiduciary relationship existed and then the jury found that defendant failed to overcome the presumption of fraud by not proving his actions were open, fair and honest. Thus, the issue of punitive damages was properly submitted to the jury.

*Melvin v. Home Federal Savings & Loan Ass'n*, 125 N.C. App. 660, 665, 482 S.E.2d 6, 8-9 (citing *Bumgarner v. Tomblin*, 92 N.C. App. 571, 576, 375 S.E.2d 520, 523, *disc. review denied*, 324 N.C. 333, 378 S.E.2d 789 (1989), and *Booher v. Frue*, 98 N.C. App. 570, 579, 394 S.E.2d 816, 821, *disc. review denied*, 327 N.C. 426, 395 S.E.2d 674 (1990)), *disc. rev. denied*, 346 N.C. 281, 487 S.E.2d 551 (1997). "Moreover, in *Compton [v Kirby*, 157 N.C. App. 1, 577 S.E.2d 905 (2003),] our Court recognized that '[p]unitive damages are justified in cases of constructive fraud, N.C. Gen. Stat. § 1D-15(a)(1) (2001), as long as 'some

compensatory damages have been shown with reasonable certainty.' "
*Babb v. Graham*, 190 N.C. App. 463, 478, 660 S.E.2d 626, 636 (2008)
(quoting *Compton*, 157 N.C. App. at 21, 577 S.E.2d at 917 (quoting
*Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 549, 356 S.E.2d
578, 587 (1987)), *disc. rev. denied*, 360 N.C. 174, 625 S.E.2d 781 (2009).

During her consideration of the Stranges' objection to the submission of a punitive damages issue to the jury, Judge Eagles stated that:

> [TRIAL] COURT: . . . I'm going to deny the motion. I think
> there's plenty of evidence to go to the jury on punitive damages[.]
> . . . . [I]f the jury believes the evidence this way, somebody who
> refused for years to disclose any information about the financial
> condition of this corporation at all, and then, in the face of some
> lawyer letters, filed liens against this property . . . when he knew
> he didn't have any evidence to support these loans, which is what
> he testified to. . . . [I]f they believe that, they could find that . . .
> appalling, and impose some punitive damages on that. And that's
> believing his testimony.

We agree with Judge Eagles that the record evidence concerning the
Stranges' conduct, if credited by the jury, would support an award of
punitive damages based on clear and convincing evidence that the
Stranges intentionally committed a fraudulent act. As a result, we
conclude that Judge Eagles did not err by allowing the jury to consider a punitive damages issue.

### E. Reimbursement Claims

[5] As we have already noted, Ms. Bogovich's complaint against the
Stranges was predicated, in large measure, on the fact that the
Stranges improperly executed and recorded notes and deeds of trust
on behalf of Embassy Club securing an alleged liability to themselves
in an amount in excess of $1,300,000.00. In response to the interrogatories inquiring about the "consideration for the indebtedness of [the]
Embassy Club" evidenced by the notes and deeds of trust, the
Stranges stated that the consideration consisted of "personal loans"
made by the Stranges and Anne Strange to Embassy Club, salaries
owed to the Stranges, and Mr. Strange's payment of certain corporate
debts. In his deposition and at trial, Mr. Strange reiterated the validity
of this assertion.

On 2 April 2009, Judge Balog conducted a nonjury proceeding for
the purpose of addressing the Stranges' reimbursement claims. At
that proceeding, Mr. Strange testified that he had made payments on

loans owed by Embassy Club, that he had advanced personal funds to Embassy Club, and that he had continued to pay Embassy Club's expenses after the 1976 fire. Mr. Strange stated that he did not receive a salary for his work on behalf of Defendant Embassy Club and that he had never asked Plaintiff Anne Bogovich for authorization to receive a salary or to obtain repayment of the money he claimed to have advanced to the corporation. On cross-examination, Mr. Strange admitted that there were errors in his claims for reimbursement and that he had kept part of the insurance settlement relating to the 1976 fire.

On 22 June 2009, Judge Balog entered an order denying the Strange's reimbursement claims, finding, in pertinent part, that:

(4) Over the course of several years until the latter part of the 1980s [Mr.] Strange advanced substantial sums of money used by the corporation in the operation of the supper club. By a preponderance of the evidence, the amount of money Mr. Strange advanced to the corporation was $120,220.70.

(5) This money was advanced by Mr. Strange to the corporation without any approval by the corporation.

(6) There were no instruments evidencing any debts to Mr. Strange for any of these alleged loans.

(7) There was no fixed interest rate or payment schedule for any of these alleged loans.

(8) These monies advanced by Mr. Strange to the corporation were used for its business purposes.

(9) There was a total disregard of corporate formalities with regard to corporate meetings and minutes.

(10) Mr. Strange did not receive any formal authorization . . . for these alleged loans. [Ms.] Bogovich was not informed of these advances of money or any details of operation of the supper club.

(11) These advances of monies by Mr. Strange were not shareholder loans and lawful debts of the corporation and this money is not owed to Mr. Strange by the corporation.

(12) Claims that these monies were shareholder loans are also absolutely barred by the applicable statute of limitations.

(13) [The] Strange[s] have asserted claims that the corporation owes them salaries for their time devoted to operation of the supper club.

(14)  There was no agreement by the corporation to pay a salary to [the] Strange[s].

(15)  There is no valid claim for salary[.]

(16)  Any claims for salary . . . are also barred absolutely by the statute of limitations.

Based on these findings of fact, Judge Balog concluded as a matter of law that:

(2)  Monies advanced by Mr. Strange to the corporation are not shareholder loans and lawful debts of the corporation and this money is not owed to Mr. Strange.

(3)  Claims for monies advanced to the corporation by Mr. Strange are barred by the statute of limitations.

(4)  Claims by [the] Strange[s] for salaries and claims under quantum meruit to recover for time spent on behalf of the corporation are not valid.

(5)  Claims by [the] Strange[s] for salaries and claims under quantum meruit to recover for time spent on behalf of the corporation are barred by the statute of limitations.

On appeal, the Stranges challenge Judge Balog's decision to reject their claim for reimbursement on several grounds.

## 1. Statute of Limitations

First, the Stranges argue that Judge Balog erred by concluding that their reimbursement claims were barred by the applicable statute of limitations. This argument lacks merit.

N.C. Gen. Stat. § 1-15(a) provides that "[c]ivil actions can only be commenced within the periods prescribed in this Chapter, after the cause of action has accrued, except where in special cases a different limitation is prescribed by statute." The Stranges do not posit any statutory or common law basis for their reimbursement claims or contend that their reimbursement claims sound in contract. As a result, we will assume for purposes of discussion that the Stranges are relying on an implied contract or oral agreement theory in support of their reimbursement claims.

According to N.C. Gen. Stat. § 1-52(1), an action "[u]pon a contract, obligation or liability arising out of a contract, expressed or implied," must be filed within three years of an alleged breach of that contract.

However, "where money is lent pursuant to an oral agreement which fails to specify a time for repayment, the repayment is due within a reasonable time. A party must bring an action to recover the repayment within three years after the reasonable time period has passed. In essence, a party has a reasonable time period plus three years in which to bring the action before it is barred by the statute of limitations." *Phillips & Jordan Investment Corp. v. Ashblue Co.*, 86 N.C. App. 186, 188, 357 S.E.2d 1, 2, *disc. rev. denied*, 320 N.C. 633, 360 S.E.2d 92 (1987).

The Stranges' reimbursement claims are based on advances made and other obligations that allegedly arose in the 1970s and 1980s. The Stranges have never filed a civil action seeking payment of their claims, even after Ms. Bogovich filed suit against them in 2004. The Stranges do not contend that the more than ten year interval between the last date upon which they provided monies or services to Embassy Club and the date upon which they first mentioned their claim against the corporation constituted a "reasonable time." Instead, they assert that their reimbursement claims were not time-barred because "the statute of limitations does not run between co-fiduciaries absent demand." We do not, however, believe that the principle upon which the Stranges rely permits the maintenance of their reimbursement claims.

Admittedly, " 'where a fiduciary relation exists between the parties, with respect to money due by one to the other, the statute of limitations does not begin to run until there has been a demand and refusal.' " *Glover v. First Union National Bank*, 109 N.C. App. 451, 455, 428 S.E.2d 206, 208 (1993) (quoting *Efird v. Sikes*, 206 N.C. 560, 562, 174 S.E. 513, 513-14 (1934)). Thus, if Ms. Bogovich had agreed that the Stranges would be repaid for monies allegedly advanced to the corporation and paid wages for work performed on behalf of the corporation, the statute of limitations might have been tolled until the Stranges requested reimbursement and Ms. Bogovich rejected that request. For example, in *Fulp v. Fulp*, 264 N.C. 20, 26, 140 S.E.2d 708, 714 (1965), the Supreme Court held that:

> Unquestionably, therefore, the statute of limitations began to run against plaintiff's claim against defendant when . . . she called upon him to perform his agreement . . . and he replied "You don't think I'm a damn fool, do you?" This was a flat repudiation of his agreement and was notice to plaintiff that he intended to misappropriate the funds which he had received from her through their confidential relationship.

In this case, however, the Stranges do not claim that an express agreement existed or that Ms. Bogovich refused to honor it. Instead, the Stranges contend that the statute of limitations was tolled until 1998, when Ms. Bogovich sent Mr. Strange what the Stranges characterized as "demand letters." Although the Stranges do not specifically identify the letters upon which they rely in support of this argument, the record indicates that Ms. Bogovich sent several letters to Mr. Strange seeking information about Embassy Club's financial status and Mr. Strange's efforts to sell the corporation's real property. Ms. Bogovich did not "demand" anything in these letters except to be provided with corporate information to which she was indisputably entitled. In addition, the Stranges never "refused" to provide the requested information; instead, after Ms. Bogovich sent another letter in 2000, Mr. Strange replied that he was "in the process of collecting the [requested] information" and would "contact [Ms. Bogovich's attorney] when [the collection process had been] completed" on 10 March 2000. The Stranges have failed to explain how this exchange of letters could be construed as a "demand and refusal" that would belatedly trigger the running of the applicable statute of limitations.

Moreover, even if the applicable statute of limitations had been tolled until 1998, the Stranges never asserted a reimbursement claim. In September 2004, the Stranges filed answers to Ms. Bogovich's interrogatories in which they stated that the challenged instruments were supported by "consideration" in the form of debts allegedly owed to the Stranges. Assuming, without in any way deciding, that these interrogatory responses were the equivalent of asserting a reimbursement claim, the Stranges have made no attempt to establish that the six year interval between 1998 and 2004 constituted a "reasonable" time to wait before seeking reimbursement for monies advanced and services provided in the 1970s and 1980s. Instead, the Stranges argue that the filing of a lawsuit by Ms. Bogovich tolled the limitations period applicable to their reimbursement claims "because no statute of limitations runs against a litigant while his case is pending in court."

The initial problem with this aspect of the Stranges' argument is that the claim pending in the judicial system was brought by Ms. Bogovich rather than the Stranges. Moreover, although the Stranges cite several cases in support of their argument:

None of them, however, is applicable to the case at bar. Each involves a plaintiff's claim against a single defendant before the

Industrial Commission and holds that while the plaintiff's claim for compensation is pending before the Commission, no statute of limitations runs against the litigant on that claim.

*Bernard v. Ohio Casualty Ins. Co.*, 79 N.C. App. 306, 308-09, 339 S.E.2d 20, 22 (1986) (citing *Giles v. Tri-State Erectors*, 287 N.C. 219, 214 S.E. 2d 107 (1975), and *Watkins v. Motor Lines*, 279 N.C. 132, 181 S.E. 2d 588 (1971)[2] (other citations omitted). The Stranges have cited no support for the proposition that litigation initiated by a plaintiff tolls the statute of limitations with respect to a defendant's counterclaim, and any such assertion would be contrary to the relevant decisions. *See e.g., State Farm Mut. Auto. Ins. Co. v. Gaylor*, 190 N.C. App. 448, 451, 660 S.E.2d 104, 106 (2008), *disc. rev. denied*, 363 N.C. 130, 676 S.E.2d 310 (2009) (stating that, where the defendants "failed to file their counterclaims within the three-year statute of limitations period," the trial court "did not err when it granted [plaintiff's] motion to dismiss the . . . counterclaims"). Thus, the filing of Ms. Bogovich's complaint does not in any way serve to toll the statute of limitations applicable to any claims asserted by the Stranges.

Finally, the Stranges assert that their "execution of the notes and deeds of trust, instruments under seal, had the effect of preserving these claims for a ten-year period from and after August 10, 2000, the date of their execution." In support of this contention, the Stranges cite N.C. Gen. Stat. § 1-47(2), which prescribes a ten year statute of limitations for actions "[u]pon a sealed instrument." The Stranges have not, however, filed any claims or counterclaims, so that they have not filed a claim or counterclaim "upon a sealed instrument," effectively rendering N.C. Gen. Stat. § 1-47(2) inapplicable to their reimbursement claims.

At bottom, the Stranges' reimbursement claims are based on monies allegedly advanced to Embassy Club and services provided to the corporation in the 1970s and 1980s. The Stranges concede that there is no written contract or express agreement providing for payment of these claims. Moreover, the Stranges do not contend that their reimbursement claims were asserted within a "reasonable time." Instead, the Stranges assert that the applicable statute of limitations was tolled until 1998, when Ms. Bogovich sought corporate information from Mr. Strange. Even if one were to accept this portion of their argument, the record clearly shows that the Stranges have never filed

---

2. *Giles* and *Watkins* are the two cases cited by the Stranges in support of their argument.

BOGOVICH v. EMBASSY CLUB OF SEDGEFIELD, INC.

[211 N.C. App. 1 (2011)]

a claim or counterclaim seeking reimbursement for these alleged advances and other obligations. Even if we were to treat the discovery responses provided by the Stranges as a "claim," these responses were not provided until 2004, a six year period which even the Stranges do not claim to have been "reasonable." The filing of Ms. Bogovich's civil action against the Stranges did not toll the statute of limitations relating to these reimbursement claims, and N.C. Gen. Stat. § 1-47(2) does not apply in this instance. As a result, we conclude that Judge Balog did not err by concluding that the Stranges' reimbursement claims were barred by the applicable statute of limitations.

### 2. Other Reimbursement Claim Issues

In addition, the Stranges argue that their failure to obtain approval for the reimbursement of the alleged advances and for the payments of the value of their services to the corporation does not preclude recovery of their claims on the grounds that "they were fair to the corporation." As a result, the Stranges contend that Judge Balog erred by ruling that Mr. Strange's advances to the corporation "were not shareholder loans, were not lawful debts of the corporation, and were not owed back to" Mr. Strange. We do not, however, need to address this facet of the Stranges' argument in light of our conclusion that their reimbursement claims were barred by the statute of limitations.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of the Stranges' challenges to Judge Eagles' and Judge Balog's decisions have merit and that the Stranges are not entitled to relief on appeal. As a result, the challenged judgments and orders should be, and hereby are, affirmed.

AFFIRMED.

Judges McGEE and STROUD concur.